# CV 13          5131          ★ FILED ★

2013 SEP 13  PM 11: 47

CLERK
U.S. DISTRICT COURT
E.D.N.Y.
AFTER HOURS DROP BOX

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

STEPHANE HOUDET and ALAN J. RICH,

                              Plaintiffs,

        -against-

UNITED STATES TENNIS ASSOCIATION, DANIEL MALASKY, DAVID BREWER, DAVID SCHOBEL, JEREMIAH YOLKUT, HARLAN STONE, GORDON SMITH, CHRIS WIDMAIER, AND JOHN AND JANE DOE (employees, agents and servants of Defendant USTA whose names are unknown),

                              Defendants.

**COMPLAINT**  ~~SUMMONS ISSUED~~

**JURY TRIAL DEMANDED**

Docket No.:          BLOCK, J.

The Plaintiffs, STEPHANE HOUDET and ALAN J. RICH,, by their attorney ALAN J. RICH, of the Law Offices of Alan J. Rich, LLC, as and for their Complaint against the Defendant UNITED STATES TENNIS ASSOCIATION ["USTA"], allege as follows upon information and belief:

## INTRODUCTION

1.      Plaintiffs bring this case against the United States Tennis Association ["USTA"] and associated Defendants, for discrimination by their continued course of action effectively banning most videotaping, broadcast and retransmission of wheelchair tennis from the US Open tennis championships and other tournaments. The

USTA has NEVER permitted any broadcast of the semi-finals or finals of the wheelchair events by any American entity or person. Defendants discriminated and retaliated against Plaintiffs in violation of the Americans with Disabilities Act and the New York State Human Rights Law. Among the type of discrimination alleged herein, is "disparate impact" discrimination, whereby a facially neutral policy or practice has a disparate adverse impact on the protected group, here disabled wheelchair tennis athletes. *See*, e.g. United States v. City of New York, (Vulcan Society case) 637 F.Supp.2d 77 (E.D.N.Y.2009) ("Disparate Impact Opinion" granting Federal Government's and Intervenors' motions for summary judgment on their Title VII disparate-impact claims).

2.      Broadcasting, video and media in a variety of forms, is the life blood of sport. It drives revenue to bring viewers to arenas and sports complexes, and to televisions, laptops, iPads, smart phones. Video will continue to do it in media that haven't even been invented yet. The US Open depends on video to generate hundreds of millions of dollars of revenue for the event and players depend on it to become known and to become attractions for fans and to bring "eyeballs" to events, advertisers and sponsors. A player's value depends largely on their ability to be seen. In this regard, wheelchair players at the US Open simply have no value because the can't get seen.

3.      Viewers watching sports and related events like press conferences, bring billions of dollars directly to sporting events in revenue as well as indirectly through rights licensing,  sponsorships to events and sponsorships and endorsements to players.

4.      Without the ability to see someone play an event, especially those of the

greatest interest such as the semi-finals and finals, most players cannot earn a living. Players do not make much in prize money and get little in the way of paid endorsements. Major sponsors of tennis, such as Nike, Chase and Mercedes Benz, all ensure that their names and logos are seen prominently in arenas, on the Internet and/or on players themselves. Without the ability to be seen in video, a player can't earn a living.

    5.    In the case of wheelchair tennis at the US Open, prior to the Plaintiffs filing of another law suit in 2009, the US Open never had a single broadcast of wheelchair tennis. RICH, in collaboration with the International Paralympic Committee (IPC), offered to record and post video footage of the matches on the website of the IPC, Paralympicsport.TV. The USTA refused and preferred to have no recording and distribution of these matches. Once played, even if they were some of the greatest matches in history, they would never be seen. An athlete could not even show a potential sponsor his/her play at the US Open. The USTA claimed they could not permit such filming because the rights had been licensed. However, this was largely false and no entity, other than the USTA itself, had the rights to the semi-finals or finals.

    6.    Though press conferences are commonplace after matches at the US Open for able bodied players, and are effectively mandatory after semi-finals and finals for those players, in the history of the US Open, there has never been a single post match press conference for a wheelchair match – not even after a finals match – not in singles, not in doubles, not for men, not for women and not in the "quad" category. Without the presentation of the sport and players to the press like is the regular practice of the USTA with able-bodied players, the press has no knowledge or familiarity with

3

the sport or its players. Wheelchair tennis at the US Open is treated like a second class sport. The Americans with Disabilities Act requires integration to the greatest degree possible. Separate is not equal. The results of these ongoing practices, is one which denies equal opportunity for economic benefit to the wheelchair tennis players.

7.      In contrast, the 2012 London Paralympics had record numbers of viewers. Channel 4 in the UK had over11 million viewers for the opening ceremonies alone. Event venues were packed and television audiences were watching record numbers for three simple reasons: 1) the level of competition was extraordinary; 2) the stories behind the athletes were equally extraordinary and 3) Channel 4 approached the event in a serious professional way to report the events and the great sports stories of the games, often using former Paralympians as commentators. The USTA has historically viewed and treated wheelchair tennis in a paternalistic manner. The USTA has no employees in their wheelchair program who are disabled and the organization has never integrated wheelchair tennis into the "professional tennis" division of its organization which runs the US Open and other professional events. In the process, the USTA's practices have resulted in the systematic discriminatory treatment of the sport and these players who earn less if they win the tournament than a first round loser in the able-bodied competition.

8.      Rather, as a response to the prior legal action instituted by HOUDET, other players and coaches and RICH, the USTA has retaliated against them and attempted to coerce players not to be affiliated with the law suit.

9.      For example, while US Open players are permitted to bring guests who are given special credentials to the Open, HOUDET has been refused that right on at

4

least one occasion. In 2010, RICH was detained at the US Open by US Open staff at the US Open.

10. The USTA has banned RICH from the USTA Tennis Center and from attending the US Open until 2021. The USTA claimed that RICH was banned for taking video of a match. However, the act was retaliatory in that RICH was using a small consumer camera which any other ticketed attendee was permitted to do when first banned on September 13, 2013. After being banned, the USTA had NYPD escort RICH off the site.

11. More recently, USTA attorney, Defendant Daniel Malasky, demanded that the New York Police Department [NYPD] arrest RICH while at Flushing Meadows Corona Park in September 2013. Police officers and commanders refused to do so as RICH was not on USTA property.

12. The US Open is one of the most important events in the world, if not the most important event, where the business of tennis is done. Banning RICH was retaliatory and was intended to show RICH's clients that the USTA was the authority in charge and was intended to keep RICH from access to the key "business of tennis" venue in the Americas and to his clients and others in the tennis world.

13. The USTA has convinced other tournaments not to issue media credentials to RICH so that he could cover and film the events. The USTA has also threatened at least one media outlet that requested credentials on behalf of RICH, causing the newspaper to withdraw its request. The USTA and Defendants have continued these and other discriminatory and retaliatory acts, which actions constitute "continuing violations."

5

14.    After HOUDET's win of the 2013 wheelchair men's singles, the USTA, which publishes news articles results at the US Open on its web site, wrote an article about wheelchair tennis finals. While ordinarily it would clearly report the winners with a story about the match and the player, it made a mention of HOUDET's win at the Open in such an oblique and confusing way, that it was almost impossible to even realize the HOUDET won the men's title. Such retaliation is illegal and also contrary to the mission of the USTA to promote the sport of tennis.

15.    While the USTA does much important grass roots support of tennis throughout the country, as an organization, it has a history of discrimination. Much of its discrimination it later disavows by various acts, such as the naming of the USTA Tennis Center the "Billie Jean King Tennis Center." But history evidences that the name was changed decades after the USTA discriminated against King.

16.    Nonetheless, America's greatest champion, Bill Tilden, a gay man, was regularly singled out and suspended by the USTA for actions which would not have been an issue for any other player. The USTA opposed the introduction of professional tennis, while "under the table" money was the norm for the US Nationals, an "amateur" event which was the forerunner to the US Open.

17.    King refers to these as "shamateur" events, since the exchange of money in the sport was the norm. But the money at such "amateur" tournaments was barely pocket change, and the USTA continued to enforce the sham of "amateur" tennis to its advantage until 1968 when professionals were allowed to play at the "US Open."

18.    When Billie Jean King and the "original 9" began a professional tour, the Virginia Slims tour, to enable women to earn a living and be respected professional

tennis players. Rather than encouraging it, the USTA started a rival league to try to put the Virginia Slims tour out of business.

19.     Times caught up with the USTA which ultimately agreed to allow professionals to play at their championship in 1968 (after years of banning the world's greatest players including the likes of Rod Laver). Years later, in 1973, the USTA it also finally agreed to equal prize money for women. One thing has been a constant. The USTA has always attempted to dominate in controlling the sport and business of tennis in the United States. It is also part owner of the Tennis Channel.

20.     The USTA's efforts to control wheelchair tennis is not only a discriminatory violation of the law, but it is harmful to these elite wheelchair athletes. The results of the USTA's policies and practices mean that the biggest tennis fans and even those inside the sport, have never seen a wheelchair tennis match.

21.     We applaud the about face that the USTA has made to mend its wrongful and discriminatory practices of the past. We hope that the USTA sees the error of its ways here – having provided the USTA with extensive plans on how to develop wheelchair tennis in a non-discriminatory win-win way for the players, the fans and the organization. The USTA has taken some token steps. However, allowing access to film and show the semi-finals and finals of an event is what any potential fan would want to see. Media events with wheelchair players when you won't get to see their matches, is an token effort which will, no doubt be used to show the court – and none of which occurred prior to the 2009 law suit.

22.     The USTA has never taken any action to remedy discrimination and unfair practices without being challenged, whether by those such as Jack Kramer (founder of

the "Kramer" men's professional tour), Charlie Pasarell (founder of the players' association the Association of Tennis Professionals or "ATP"), Billie Jean King and so many others who forced the hand of the USTA to do the right thing. These practices took decades to remedy and Plaintiffs do not intend to let such discrimination and retaliation to go on unremedied.

23.     The end goal of any tournament, for player or fan, is the championship match or game. Because the USTA has never permitted any American entity to film or broadcast a semi-final or a final, there are no fans of the sport. Historically, there have been almost no fans attending these matches, except for those connected to the players or the sport, and those fans incidentally at the venue wandering by after another event has ended. As there is no video record, not even an archival record, of these elite level matches – something which exists for able bodied players going back many decades, a fan base cannot even be developed by Internet viewers watching past matches.

24.     HOUDET is the 2013 US Open winner in the Men's Wheelchair Singles division. Despite playing in a wheelchair, STÉPHANE HOUDET ["HOUDET"] serves at over 100 miles per hour. HOUDET is also the 2013 Roland Garros winner. He has won championships at the Paralympic games, Wimbledon and at dozens of other important international tournaments. He is a world class athlete whose left leg was amputated due to a motorcycle injury.

25.     Plaintiff ALAN J. RICH is a attorney, journalist and film maker who has represented HOUDET as an attorney and covered the sport of tennis and wheelchair tennis in particular.

8

26.     Wheelchair tennis is a form of tennis that has grown to have over 100 professional tournaments world-wide. It is played at the Paralympics every four years. The players are elite level professional athletes who compete at the highest level of the sport. They are required to travel to and play at the four "majors," the US Open, Wimbledon, Roland Garros and the Australian Open. They must train as seriously as any elite level athlete with all the necessary commitment to practice, to strength and conditioning, diet and mental toughness.

27.     While elite level wheelchair tennis players must play roughly 20 tournaments the world over per year, even the best of those players cannot earn a living from the prize money alone. A first round "able-bodied" singles loser at the US Open earns more at $32,000, than the winner of the wheelchair tournament at the US Open (under $20,000 winning singles and playing doubles).

28.     The US Open singles winners earn about 200 times what the wheelchair winner earns.[1] With bonus money, that could increase to $3.6 million. The amounts of prize money for the wheelchair tennis players is so small by comparison, that the USTA does not even list the amounts of prize money for wheelchair players as it does for able-bodied players on its web site. Winners of the able bodied men's and women's singles tournament earn $2.6 million with a chance at an additional $1 million bonus. *See* http://www.usopen.org/en_US/about/history/prizemoney.html

---

[1] Accordingly to Billie Jean King, when the Open Era began and professionals played in all the major tournaments, men were being paid about 12 times as much as women in prize money. The discrepancy was not remotely as significant as between able-bodied and wheelchair tennis players. *See,* PBS "American Masters: Billie Jean King" documentary film at http://www.pbs.org/wnet/americanmasters/episodes/billie-jean-king/film-billie-jean-king/2637/

29.     Prize money and money from endorsements would surely rise if the wheelchair events could be seen. Defendant USTA has continued to block efforts to permit these champions from being seen in any meaningful way on television, the Internet, film or otherwise. Defendants have continued to discriminate and retaliate against Plaintiffs since at least 2009 when various players and coaches and RICH sued the USTA.

30.     Plaintiff HOUDET alleges that Defendants discriminated in violation of the Americans with Disabilities Act and New York State Human Rights Law based on his disability and that they have retaliated against him because of his complaints and law suit against the USTA. RICH alleges that as a result of Defendants' discrimination and actions, he was injured by the denial of the right to film and show match footage, interviews, "B roll" and other items including as a result of the discrimination against HOUDET and against wheelchair players, and that he was injured as a result of his association with HOUDET and with disabled persons, and that Defendants retaliated against him.

31.     Plaintiffs also allege that they have been injured in various ways, including by the USTA's creation of a boycott and blacklist against RICH and that the USTA has acted to restrain trade.

32.     The 21st century is characterized by ubiquitous news, audio and video communications available literally to our hands in the forms of smart phones, Ipads and other devices. But, to see the US Open match play of the world's greatest *wheelchair tennis athletes* who hail from as far away as Africa, North and South America, Asia, Australia, the Middle East and Europe, one must physically go to Flushing Meadows in

Corona, New York – though dozens of matches of non-disabled players over the two week competition can be seen in the most remote corners of the world on video, delivered in a variety of formats. As a result, there is an undeniable discriminatory impact upon professional wheelchair tennis players who struggle to earn a living.

## THE PARTIES

33.     Plaintiff STEPHANE HOUDET ["HOUDET"], is a professional wheelchair tennis player.

34.     HOUDET is the 2013 Men's Wheelchair Champion at the US Open and Roland Garros (French Open). HOUDET is also the winner of the 2013 doubles championship at Roland Garros and at Wimbledon (where there is no wheelchair singles tournament).

35.     HOUDET is oldest male to win the US Open (or its predecessor US Nationals) in any category at age 42.

36.     Plaintiff ALAN J. RICH, resides at 31 Montgomery Place, Brooklyn, New York.

37.     Plaintiff HOUDET has a left leg amputation above the knee.

38.     Plaintiff HOUDET is a person with a "disability" pursuant to the Americans with Disabilities Act of 1990 ("ADA").

39.     Plaintiff RICH has been HOUDET's attorney in connection with a disability discrimination law suit against the USTA.

40.     Plaintiff RICH is also a journalist and documentary film maker and has been making a film about wheelchair tennis.

11

41.    RICH has been an accredited journalist at the US Open, Roland Garros and various events in Europe and the United States.

42.    Plaintiff RICH is associated with a person with a "disability."

43.    Defendant USTA is a "public accommodation" as defined by the Americans with Disabilities Act*.

44.    Defendant USTA operates the US Open tennis championships at the Billie Jean King Tennis Center in Queens, New York.

45.    Defendant USTA is headquartered in White Plains, New York.

### JURISDICTION

46.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. 1331 and 1343.

47.    All causes of action not relying exclusively on the Americans With Disabilities Act as a basis of the Court's jurisdiction, are based on the pendant jurisdiction available before this Court to hear related state causes of action.

### AS AND FOR A FIRST CAUSE OF ACTION-
### "AMERICANS WITH DISABILITIES ACT":

48.    Plaintiffs repeat and reiterate each and every allegation above as though set forth herein in their entirety.

49.    That this cause of action is brought under the Americans with Disabilities Act of 1990, Title III [42 USC 12181 *et seq*.].

50.    That Plaintiff HOUDET has a left leg amputation above the knee.

51.     That Plaintiff has a "disability" within in the meaning of the Americans with Disabilities Act in that he is an amputee.

52.     That Defendant USTA is a "Public Accommodation," *inter alia,* in that it is a "stadium, or other place of exhibition or entertainment...or other place of public gathering." [42 USC 12181]

53.     That Defendant USTA is prohibited from discriminating against persons with disabilities and person associated with such protected persons.

54.     That Defendant USTA discriminated against HOUDET based on his disability by disparately impacting him and by disparately treating him. Such actions include but are not limited to refusal to allow video filming and broadcasting of wheelchair events, including the semi-finals and finals, by treating him in an inferior and separate way including failing and refusing to hold post-match press conferences for the wheelchair tennis players whereas such practice is routine for non-disabled players. Such press conferences are a benefit, privilege and advantage provided, expose the players to the press and to the public directly when transmitted live or recorded on the USTA website or in numerous other media outlets.

55.     That Defendant USTA failed to otherwise provide equal opportunity to the privileges, benefits and advantages otherwise afforded non-disabled players, and also fails to provide its privileges, benefits and advantages in the most integrated setting. This includes benefits of press, marketing, sponsorship, and other aspects of the tournament. Major sponsors who participate in the Open, such as Chase, IBM, Mercedes Benz, Xerox and others, have no connection to the wheelchair event. Sponsors are not sought for the wheelchair event since it is understood that there will

be no coverage or virtually no coverage of the event, and therefore the efforts to obtain sponsors for the able-bodied portion of the event are not made in any way for the wheelchair event.

56.     That to the degree that any such actions caused "disparate impact" and may have been as a result of inadvertence, ignorance, negligence or otherwise were unintentional, Plaintiffs provided a comprehensive plan to Defendants in 2009 as to how to become compliant. To the degree Defendants continue to perpetuate any such acts thereafter, they have been doing so knowingly, willingly, willfully and intentionally. Therefore their actions thereafter were intentional and constitute disparate treatment.

57.     That as a result of Defendants policies and practices, Plaintiff RICH, has been unable to film any of the wheelchair matches and related events and non-match footage requested and was therefore damaged.

58.     Plaintiff HOUDET has lost income as a result of Defendants' action, including potential endorsements from companies that have indicated a desire to sponsor him if he were seen in the media at the US Open.

59.     As a result of Defendants actions in violation of the Americans with Disabilities Act, Plaintiffs were injured and damaged.

60.     The Americans with Disabilities Act prohibits discrimination based on disability.

61.     Plaintiffs have been excluded from participating in, denied the benefits of and been discriminated against, with regard to appropriate and fair access to services provided by the above-identified Defendants.

62.     That the Plaintiffs has been damaged and injured as a result thereof.

14

63.     By reason of the foregoing, Plaintiff prays for injunctive relief to remedy the discriminatory practices of Defendant, including those proposals made to Defendants by RICH in December 2009, including but not limited to alternative methods of selling/distributing/licensing rights and granting permission to film and distribute wheelchair tennis and associated footage, including the separation of rights to insure anyone acquiring the rights to wheelchair tennis would exercise the rights or lose them for that year; including but not limited to establishment of practices and procedures that remedy Defendants' discriminatory actions, including but not limited to permitting the filming and distributing of rights for wheelchair tennis, to the full inclusion of wheelchair tennis and its players in the life, services, privileges and benefits of the US Open, including, for example, holding of press conferences in the press conference rooms of the media center, doing on court post-match on camera interviews and other similar actions as a done for non-disabled players, placement on show courts or similar remedies for semi-finals and finals, equal treatment in connection with sponsors, advertisers, in marketing, selling and advertising of the wheelchair game, and other actions to be determined following discovery, to provide Plaintiff wheelchair players with an equal opportunity at the US Open; with regards to RICH, the grant of rights to film, use, broadcast and replay wheelchair matches and related footage of the US Open, cessation of boycotting, blacklisting and interfering in RICH's attendance at the Open and to come to the premises of the USTA Tennis Center, cessation of all actions which have caused and/or encouraged any media outlet or other entity to deny RICH credentials, that the USTA shall grant RICH credentials to events for which he presents a proper request, that the USTA shall stop taking any actions outside of actions

15

permissible in a legal action, that adversely impact RICH in his capacity as a journalist, film maker, attorney or attendee at any USTA sponsored or affiliated event.

## AS AND FOR A SECOND CAUSE OF ACTION-
## "AMERICANS WITH DISABILITIES ACT - RETALIATION":

64. Plaintiffs repeat and reiterate each and every allegation above as though set forth herein in their entirety.

65. That this cause of action is brought under the Americans with Disabilities Act of 1990, Title V.

66. Defendants have retaliated against Plaintiffs, including refusal of guest passes to HOUDET and RICH, in encouraging media outlets to deny credentials to RICH, in encouraging entities to take adverse action against RICH including the denial of press accreditation at tournaments and other events, in banning RICH from the premises of the USTA Tennis Center, in arresting, holding and improperly attempting to have RICH arrested for otherwise lawful activities, in creating a boycott and blacklist of RICH as a journalist, film maker and attorney. Upon information and belief, Defendants have encouraged current and former clients to speak with them in violation of ethical and professional requirements. Defendants have intentionally reported HOUDET's victory at the US Open in a way that was so convoluted that it was unintelligible. Defendants' should be required to treat HOUDET equally to any other player and report same as would ordinarily be done.

67. As a result of Defendants retaliatory actions, Plaintiffs were injured and damaged.

16

68.    As a result of Defendants' retaliatory actions, Plaintiffs were injured and damaged and should be awarded compensatory damages in the amount of SIX MILLION ($6,000,000.00) DOLLARS, or the maximum amount of statutorily permitted damages.

69.    As a result of Defendants retaliatory actions, Plaintiffs are entitled to punitive damages in the amount of TWELVE MILLION ($12,000,000.00) DOLLARS or the maximum amount of statutorily permitted damages.

### AS AND FOR A THIRD CAUSE OF ACTION-- NEW YORK STATE HUMAN RIGHTS LAW - [NYSHRL]:

70.    Plaintiffs repeat and reiterate each and every allegation above as though set forth herein in their entirety.

71.    Defendants USTA operates the US Open Tennis Championship in Queens, New York.

72.    The US Open is a "place of public accommodation, resort or amusement" as referred to in New York State Human Rights Law, Executive Law Sec. 292 (9).

73.    Plaintiff HOUDET has a "disability" as defined in New York State Human Rights Law, Executive Law Sec. 292.

74.    New York State Human Rights Law prohibits discrimination by a "public accommodation" [NYSHRL § 296 [2] [a] and that it "shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement, because of the...disability...**directly or indirectly**, to refuse, withhold from or deny to

17

such person any of the accommodations, advantages, facilities or privileges thereof..."

75.     The NYSHRL provides that "Equality of opportunity [is] a civil right". NYSHRL § 291 [2]

76.     The USTA provides a host of opportunities to players which earning large revenue for itself, paying its top executive in the millions of dollars, notwithstanding that it is a "not-for-profit" corporation.

77.     NYSHRL § 291 [2] declares that, "The opportunity to obtain education, the use of places of public accommodation and the ownership, use and occupancy of housing accommodations and commercial space without discrimination because of age, race, creed, color, national origin, sexual orientation, military status, sex, marital status, or disability, as specified in section two hundred ninety six of this article, is hereby recognized as and declared to be a civil right."

78.     For that "civil right" to an "equal opportunity" to be meaningful, one must first examine what are the benefits, privileges and services which are provided to non-disabled persons at the event – including the benefits of the opportunity for media exposure. Even where there is no "right" to media exposure itself, the right to "equal opportunity" in a discrimination context means that there must be equal opportunity compared to others. If such a benefit is routinely offered to non-disabled athletes, to be filmed and shown in match play, to have press conferences, and other similar activities, it is discriminatory not to afford such similar opportunities to Plaintiff Houdet, a disabled wheelchair tennis player.

79.     Defendants DANIEL MALASKY, DAVID BREWER, DAVID SCHOBEL, JEREMIAH YOLKUT, HARLAN STONE, GORDON SMITH, CHRIS WIDMAIER, AND

18

JOHN AND JANE DOE, were employees of Defendant USTA.

80.    Defendants DANIEL MALASKY, DAVID BREWER, DAVID SCHOBEL, JEREMIAH YOLKUT, HARLAN STONE, GORDON SMITH, CHRIS WIDMAIER, AND JOHN AND JANE DOE, are employees of Defendant USTA.

81.    At all times herein, Defendants DANIEL MALASKY, DAVID BREWER, DAVID SCHOBEL, JEREMIAH YOLKUT, HARLAN STONE, GORDON SMITH, CHRIS WIDMAIER, AND JOHN AND JANE DOE, acted within the scope of their employment as employees of Defendant USTA.

82.    Defendants acted or failed to act, which actions caused or permitted the within discrimination and/or retaliation to occur and/or continue.

83.    Defendants DANIEL MALASKY, DAVID BREWER, DAVID SCHOBEL, JEREMIAH YOLKUT, HARLAN STONE, GORDON SMITH, CHRIS WIDMAIER, AND JOHN AND JANE DOE discriminated against Plaintiffs.

84.    Defendants DANIEL MALASKY, DAVID BREWER, DAVID SCHOBEL, JEREMIAH YOLKUT, HARLAN STONE, GORDON SMITH, CHRIS WIDMAIER, AND JOHN AND JANE DOE retaliated against Plaintiffs.

85.    Defendants illegally boycotted and blacklisted RICH in violation of New York State Human Rights Law § 296 [13], encouraging various persons and entities not to do business with RICH, including tennis tournaments, newspapers and media outlets.

86.    Defendants DANIEL MALASKY, DAVID BREWER, DAVID SCHOBEL, JEREMIAH YOLKUT, HARLAN STONE, GORDON SMITH, CHRIS WIDMAIER, AND JOHN AND JANE DOE aided and/or abetted in the discrimination and/or retaliation

19

against Plaintiffs.

87.     As a result of the Defendants actions and/or failures to act, in violation of New York State Human Rights law, Plaintiffs were damaged and injured.

88.     Plaintiff RICH has a right to a cause of action by virtue of NYSHRL § 297 [9] which provides that "Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages...and such other remedies as may be appropriate." The statutory language providing "any person claiming to be aggrieved."

89.     Federal courts have long recognized that the phrase "any person aggrieved" supports claims for "associational discrimination" under the Rehabilitation Act. Nodleman v. Aero Mexico, 528 F.Supp. 475, 479-80 (C.D.Cal.1981). The Second Circuit recognized standing to assert a claim for associational discrimination under the Rehabilitation Act in Innovative Health Sys., Inc. v. City of White Plains, 117 F.3d 37, 46-48 (2d Cir.1997), accord, Loeffler v. Staten Island University Hosp., 582 F. 3d 268 (2d Cir. 2009). The language in the Rehabilitation Act is virtually identical to that of the NYSHRL.

90.     NYSHRL § 300 mandates that, "[t]he provisions of this article shall be construed liberally for the accomplishment of the purposes thereof."

91.     The "purposes" of the NYSHRL are stated at § 290 as follows:

> 2. It shall be deemed an exercise of the police power of the state for the protection of the public welfare, health and peace of the people of this state, and in fulfillment of the provisions of the constitution of this state concerning civil rights.
>
> 3. The legislature hereby finds and declares that the state

has the responsibility to act **to assure that every individual within this state is afforded an equal opportunity to enjoy a full and productive life and that the failure to provide such equal opportunity, whether because of discrimination, prejudice, intolerance or inadequate education, training, housing or health care not only threatens the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants.**

NYSHRL § 290 (emphasis supplied)

92.     Accordingly, Plaintiff Rich has a proper cause of action under the NYSHRL.

93.     By reason of the foregoing, Plaintiffs have been damaged in the amount of SIX MILLION ($6,000,000.00) DOLLARS.

## AS AND FOR A FOURTH CAUSE OF ACTION: RETALIATION PURSUANT TO THE NYSHRL

94.     Plaintiffs repeat and reiterate each and every allegation above as though set forth herein in their entirety.

95.     NYSHRL provides at § 296 [7], "[i]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article.

96.     Defendants have retaliated against Plaintiffs RICH and HOUDET because of their actions in support of their rights under this and other antidiscrimination laws.

21

97.     At all times, Plaintiffs acted in suing Defendant USTA in a prior lawsuit and taking other actions, with the good faith, reasonable belief that the underlying challenged actions of the USTA violated the law. [Treglia v. Town of Manlius, 313 F. 3d 713. (2d Cir. 2002)]

98.     Defendants retaliated against Plaintiffs.

99.     As a result of said retaliation, Plaintiffs were damaged and injured.

100.    By reason of the foregoing, Plaintiff has been damaged in the amount of SIX MILLION ($6,000,000.00) DOLLARS in compensatory damages.

WHEREFORE, Plaintiffs demands judgment against the Defendants as follows:

**FIRST CAUSE:**

Injunctive relief to remedy the discriminatory practices of Defendants as described above and which shall be modified based on discovery and information learned in this action and,

**SECOND CAUSE:**

Injunctive relief to remedy the discriminatory practices of Defendants as described above and which shall be modified based on discovery and information learned in this action and,

SIX MILLION ($6,000,000.00) DOLLARS in compensatory damages and TWELVE MILLION ($12,000,000.00) DOLLARS in compensatory damages;

**THIRD CAUSE:**

Injunctive relief to remedy the discriminatory practices of Defendants as described above and which shall be modified based on discovery and information

learned in this action and,

SIX MILLION ($6,000,000.00) DOLLARS in compensatory damages;

**FOURTH CAUSE:**

Injunctive relief to remedy the discriminatory practices of Defendants as described above and which shall be modified based on discovery and information learned in this action and,

SIX MILLION ($6,000,000.00) DOLLARS in compensatory damages;

Defendants acted with malice or reckless indifference to the protected rights of Plaintiffs, Plaintiffs therefore seek punitive damages in an appropriate amount,

Plaintiff also seeks costs, disbursements, interest and attorneys fees (as provided for pursuant to 42 USC 12205 and Americans with Disabilities Act regulations at sec. 36.505 and 29 U.S.C. 794a) and such other and further relief as this Court deems just and proper.

Dated: New York, New York
September 13, 2013

Respectfully submitted,

Alan J. Rich, Esq. (AR 4701)
LAW OFFICES OF ALAN J. RICH, LLC
ATTORNEYS FOR PLAINTIFFS
26 Court Street, Suite 1809
Brooklyn, NY 11242
Tel: (212) 921-2244
Email: ARich@RichLaw.US

23